David A. Robinson, Esq. (Bar No. 107613)
*drobinson@ecg.law*
Anjuli B. Woods, Esq. (Bar No. 270014)
*awoods@ecg.law*
Eric G. Salbert, Esq. (Bar No. 276073)
*esalbert@ecg.law*
Thomas S. Van, Esq. (Bar No. 209632)
ENTERPRISE COUNSEL GROUP
A Law Corporation
Three Park Plaza, Suite 1400
Irvine, California 92614
Telephone:  (949) 833-8550
Facsimile:   (949) 833-8540

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| M. WESTLAND, LLC, a Delaware limited liability company; DOROTHY SUBLETT-MILLER and WALTER J. MILLER, successor trustees of the Miller Family Trust, originally dated October 12, 1979, Amended and Restated February 05, 2004, for the estate of Willis L. Miller, deceased, as to an undivided ½ interest; DOROTHY SUBLETT-MILLER and WALTER J. MILLER, successor trustees of the Miller Family Trust, originally dated October 12, 1979, Amended and Restated February 05, 2004, for the estate of Dorothy M. Miller, deceased, as to an undivided ½ interest; and LAND PARTNERS, LLC, a California limited liability company formerly known as LAND PARTNERS CO. LTD,<br><br>          Plaintiffs,<br><br>vs.<br><br>CALIFORNIA DEPARTMENT OF TRANSPORTATION; LAURIE BERMAN, in her official capacity as Director, California Department of Transportation; and ORANGE COUNTY TRANSPORTATION AUTHORITY, a public entity,<br><br>          Defendants. | CASE NO. 8:19-cv-01661 JVS (KESx)<br><br>HON. JAMES V. SELNA COURTROOM 10C<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:   December 23, 2019<br>Time:  1:30 p.m.<br>Dept:   Courtroom 10C<br><br>[*Concurrently Filed Notice of Motion, Declaration of Brad Sublett, Declaration of Khoon Tan, Declaration of William E. Fleenor, Declaration of Anjuli Woods, Compendium of Exhibits, (Proposed) Order*] |

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

P&As.docx/1251-017-02

# TABLE OF CONTENTS

Page(s)

I.   INTRODUCTION ...................................................................................... 1

II.  FACTUAL BACKGROUND ...................................................................... 3

    A.   THE AFFECTED PROPERTY RELIES ON A DRAINAGE SYSTEM ADJACENT TO THE I-405 AND WITHIN THE PROJECT AREA ........................................................................ 3

    B.   DEFENDANTS ARE NOW INSTALLING A NEW DRAINAGE SYSTEM THAT WILL IMPEDE DRAINAGE AND CAUSE FLOODING ................................................................. 4

    C.   DEFENDANTS' FIRST AND ONLY ENVIRONMENTAL ANALYSIS DOES NOT CONSIDER POTENTIAL IMPACTS OF THE (THEN NON-EXISTENT) CURRENT PLANS. ................. 7

III. STANDARD ................................................................................................ 8

IV.  ARGUMENT ............................................................................................... 9

    A.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR NEPA CLAIM. .................................................. 9

        1.   DEFENDANTS MUST ASSESS THE ENVIRONMENTAL IMPACTS OF THEIR CURRENT PLANS ON THE AFFECTED PROPERTY ........................... 9

        2.   WHERE INFORMATION IN AN INITIAL EIS WAS SO INCOMPLETE OR MISLEADING THAT THE DECISIONMAKER OR THE PUBLIC COULD NOT MAKE AN INFORMED COMPARISON OF THE ALTERNATIVES, A SUPPLEMENTAL EIS IS NECESSARY ........................................................................ 12

        3.   ALTHOUGH AN AGENCY'S DECISION IS REVIEWED UNDER AN ABUSE OF DISCRETION STANDARD, UNDER NEPA THE COURT MUST DECIDE WHETHER THE AGENCY TOOK A "HARD LOOK" AT THE ENVIRONMENTAL CONSEQUENCES OF ITS PROPOSED ACTIONS AND REASONABLY EVALUATED THE RELEVANT FACTS ....................................................................... 13

        4.   DEFENDANTS MUST ASSESS THE ENVIRONMENTAL IMPACTS OF THEIR CURRENT PLANS BEFORE CONSTRUCTING THE DRAINAGE SYSTEM ...................................................................... 14

5.    ALLOWING DEFENDANTS TO BUILD WHILE IGNORING POTENTIALLY HARMFUL ENVIRONMENTAL IMPACTS UNTIL AFTER THEY OCCUR FLOUTS THE VERY PURPOSE OF NEPA ........... 16

B.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION. ........................................... 16

C.    THE BALANCE OF EQUITIES WEIGH IN PLAINTIFFS' FAVOR. ....................................................................... 17

D.    A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST. ................................................................ 18

E.    PLAINTIFFS EXHAUSTED EVERY EFFORT TO AVOID THE NEED FOR THIS MOTION. ....................................... 18

F.    THE COURT SHOULD NOT IMPOSE A BOND. .......................... 20

V.    CONCLUSION .......................................................................... 21

# TABLE OF AUTHORITIES

Page(s):

Cases

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*
 67 F.3d 723 (9th Cir. 1995) ........................................................................16

*Amoco Prod. Co. v. Village of Gambell*
 480 U.S. 531 (1987) ....................................................................................22

*Animal Def. Council v. Hodel* 840 F.2d 1432, 1439 (9th Cir. 1988) ......................17

*Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*
 2016 U.S. Dist. LEXIS 192573, at *167-70 (C.D. Cal. Feb. 1, 2016) ...............18

*Ctr. for Biological Diversity v. U.S. Forest Serv* 349 F.3d 1157, 1166 (9th Cir. 2003)...........................................................................................................20

*Faith v. Texas Dep't of Transp.* 924 F.3d 132, 135 n.1 (5th Cir. 2018) .................14

*Friends of the Clearwater v. Dombeck*
 222 F.3d 552 (9th Cir. 2000).......................................................................15

*Idaho Sporting Congress v. Thomas*
 137 F.3d 1146 (9th Cir. 1998).....................................................................16

*Idaho Sporting Congress, Inc. v. Alexander*
 222 F.3d 562 (9th Cir. 2000).......................................................................20

*Johnston v. Davis*
 698 F.2d 1088 (10th Cir. 1983)....................................................................17

*Klamath Siskiyou Wildlands Ctr. v. Boody*
 468 F.3d 549 (9th Cir. 2006).......................................................................16

*Lands Council v. McNair*
 537 F.3d 981 (9th Cir. 2008).......................................................................22

*League of Wilderness Defenders/Blue Mts. Biodiversity Project v. Connaughton*,
 752 F.3d 755 (9th Cir. 2014)........................................................................14

*Marsh v. Oregon Natural Res. Council*
 490 U.S. 360 (1989) ....................................................................................21

*Metcalf v. Daley*
 214 F.3d 1135 (9th Cir. 2000).......................................................................20

*National Wildlife Federation v. Andrus*
 440 F. Supp. 1245 (D.D.C. 1977) ................................................................18

*Native Ecosystems Council v. U.S. Forest Serv.*
    418 F.3d 953 (9th Cir. 2005)...................................................................19

*Pacificans for a Scenic Coast v. Cal. Dep't of Transp.*
    204 F. Supp. 3d 1075 (N.D. Cal. 2016) .................................................14

*People ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*
    766 F.2d 1319 (9th Cir.)...........................................................................25

*Price Rd. Neighborhood Ass'n, supra*
    113 F.3d at 1509.....................................................................................19

*Save the Yaak Comm. v. Block* 840 F.2d 714 (9th Cir. 1988) ..................20

*Sierra Club v. United States Forest Serv.*
    843 F.2d 1190 (9th Cir. 1988)..............................................................16

*Thomas v. Peterson*
    753 F.2d 754 (9th Cir. 1985)................................................................20

*U.S. Philips Corp. v. KBCBank N.V.*
    590 F.3d 1091 (9th Cir. 2010) ............................................................14

*Warm Springs Dam Task Force v. Gribble*
    621 F.2d 1017, 1024 (9th Cir. 1980)..................................................15

*Winter v. NRDC, Inc.*
    555 U.S. 7 (2008) ................................................................................14

*California ex rel. Imperial Cnty.*, 767 F.3d at 792
    349 F.3d at 1166..................................................................................19

*Sammartano v. First Judicial Dist. Court*
    303 F.3d 959 (9th Cir. 2002) ..............................................................23

*City of South Pasadena v. Slater*
    56 F. Supp. 2d 1106, 1148 (C.D. Cal. 1999)......................................25

*WildEarth Guardians v. Montana Snowmobile Ass'n*
    790 F.3d 920 (9th Cir. 2015) ..........................................................15,16

Statutes

23 U.S.C. § 327................................................................................................14

40 C.F.R. § 1502.9(c)(1)(i)–(ii)....................................................................15

# I.     **INTRODUCTION**

Defendants California Department of Transportation ("CALTRANS") and Orange County Transportation Authority ("OCTA," together with CALTRANS, "DEFENDANTS") are presently installing a *permanent* drainage system on property in Westminster, California ("AFFECTED PROPERTY") collectively owned by plaintiffs M. Westland, LLC, Dorothy Sublett-Miller, Walter J. Miller and Land Partners, LLC (collectively, "PLAINTIFFS").  As explained herein, this *permanent* drainage system *will* impede drainage, thus is *virtually certain* to cause *widespread flooding* on and near property where *thousands of mobile home residents live* and where *many dozen others work*.

The drainage system is part of the San Diego Freeway (I-405) Improvement Project ("PROJECT") that DEFENDANTS are now directing and controlling as the lead and responsible government agencies.  Despite the potentially catastrophic impacts of the drainage system, DEFENDANTS, in direct violation of the National Environmental Policy Act ("NEPA"), have failed to assess and disclose its foreseeable environmental impacts and potential alternatives *before* beginning construction.  They do not dispute as much.  Rather, in recently filed motions to dismiss, CALTRANS and OCTA paradoxically argue PLAINTIFFS' instant lawsuit is not yet "ripe" because CALTRANS has *not yet approved* the drainage sub-system the OCTA is now constructing, not yet determined what DEFENDANTS are going to do to prevent virtually certain flooding, thus not yet decided whether a further environmental review under NEPA is necessary. (Dkt. 16 at 11; Dkt. 18 at 10–11.)  Yet, as the Court reads this motion, the *concrete encased*, *underground* drainage system is actually being installed.  Moreover, while DEFENDANTS' motion complains PLAINTIFFS acted too early, counsel for the OCTA recently informed counsel for PLAINTIFFS:

> You have proposed that our respective engineers meet to discuss
> the drainage system being installed.  I understand that the purpose of

1

this meeting would be to engender assurances that something is being done to prevent another flooding event like the kind experienced in January and/or February earlier this year.  Although a meeting of our engineers may be productive in the near term, I do not feel such a meeting would provide greater assurances than the work that is being done right now.

As you are aware, OCTA's contractor is diligently working to install a drainage system adjacent to your client's property.  We may disagree as to whether the drainage system going in is sufficient, but something is going in that is different than what was in place in January/February of 2019.  OCTA expects that your client will see improvement of the drainage conditions.  *It is too late to dither about the drainage system being installed now.  A meeting of our engineers at this time cannot, as a practical matter, change the course of the design currently being implemented*.

 (WOODS DECL. ¶ 8, PLAINTIFFS' Compendium of Exhibits ("COMPENDIUM"), Ex. 8, emphasis added).

Accordingly, after numerous failed "meet and confer" attempts, PLAINTIFFS move to compel DEFENDANTS' compliance with NEPA and, in the meantime, to stop DEFENDANTS' construction of a drainage system that poses an imminent risk of flooding, danger to life and widespread property damage. PLAINTIFFS also seek an order requiring DEFENDANTS to immediately devise and put a plan in place to prevent likely flooding (*e.g.*, provide for the prompt deployment of emergency pumping equipment, hoses, etc.) while this environment impact assessment is in progress.

/ / /

/ / /

/ / /

## II.    FACTUAL BACKGROUND

### A. The AFFECTED PROPERTY Relies on a Drainage System Adjacent to the I-405 and Within the PROJECT Area

Located south of the interchange of I-405 and State Route 22 in Westminster, California on a 79.423-acre tract of land, the AFFECTED PROPERTY is home to thousands of Orange County residents who live in manufactured and mobile homes within the Los Alisos Mobile Home Estates ("MOBILE HOME PARK"). (SUBLETT DECL. ¶ 5.)  The MOBILE HOME PARK has been in continuous operation since 1968.  It contains 700 residential units (on 665 mobile home spaces), 44 recreational vehicles ("RV") spaces and a common area that includes a rental office, three clubhouses, storage and maintenance buildings, two pools, two spas and three laundry rooms.  (SUBLETT DECL. ¶ 5.)  The MOBILE HOME PARK also employs dozens of workers.  (SUBLETT DECL. ¶ 5.)  A recreational vehicle dealership employing dozens of people also leases a significant portion of the AFFECTED PROPERTY.  (SUBLETT DECL. ¶ 6.)

The I-405 is immediately adjacent to, and runs along, the AFFECTED PROPERTY's southwest boundary.  Since the I-405 was first constructed in the 1960s, the AFFECTED PROPERTY has relied on a drainage system the State of California ("STATE") installed within a right of way between the AFFECTED PROPERTY and the I-405.  (SUBLETT DECL. ¶ 7.)  The drainage system was necessary as the I-405 is constructed on an elevated embankment.  This creates a damming condition.  The damming condition impedes the flow of "upslope" surface water.  Before the I-405 was constructed, surface water flowed freely across the AFFECTED PROPERTY onto "downslope" properties and eventually into the nearby Bolsa Chica estuary.  Given this readily foreseeable "environmental impact", when the STATE acquired its right-of-way over a portion of the AFFECTED PROPERTY to construct the I-405, the STATE agreed in a recorded right-of-way agreement ("ROW") "to accept drainage onto the State highway right

of way from grantor's property." (SUBLETT DECL. ¶ 8–9, COMPENDIUM Ex. 1 at § 12.)  The ROW expressly recites such drainage acceptance was necessary "in order to develop" the AFFECTED PROPERTY.  (SUBLETT DECL. ¶ 10, COMPENDIUM Ex. 1 at § 7.)  Accordingly, CALTRANS, as a STATE agency, has been on both actual and constructive notice of its recorded obligation to "accept drainage" from the AFFECTED PROPERTY since before the I-405 was constructed.

**B. DEFENDANTS Are Now Installing a New Drainage System that Will Impede Drainage and Cause Flooding**

The I-405 is an approximately 72-mile long, north-south freeway in Orange and Los Angeles counties, California.  The PROJECT will expand an approximately 16-mile stretch of the I-405 in Orange County between State Route 73 and Interstate 605 by adding a "general purpose" lane and a "tolled Express Lane" in each direction of the I-405.  (WOODS DECL. ¶¶ 3-4, COMPENDIUM Ex. 3 at S-1, S-6; Ex. 4 at 2, 27.)  Auxiliary lanes will also be added at various locations along this 16-mile stretch.  (WOODS DECL. ¶¶ 3-4, COMPENDIUM Ex. 3 at S-8; Ex. 4 at 3–5.)

PLAINTIFFS do _not_ oppose this PROJECT.  PLAINTIFFS only oppose a small segment of the PROJECT certain to turn a significant portion of the AFFECTED PROPERTY into an extended flood control basin during periods of significant rain.

In the latter regard, as part of the PROJECT, CALTRANS and OCTA are currently installing a new drainage system next to the AFFECTED PROPERTY.  The plans for this new drainage system _did not exist_ when the one and only environmental impact statement for the PROJECT was released for public comment and ultimately approved in early 2015.  _They were developed years later_.  The first known iteration of these plans was first revealed to PLAINTIFFS (after numerous requests) in January 2019, and have since undergone multiple revisions. (WOODS

DECL. ¶¶ 5, 6, 7 & 9, COMPENDIUM Exs. 5, 6, 7 & 9.)  The most recent and current version of those plans were first provided to PLAINTIFFS on September 4, 2019 ("CURRENT PLANS").  (WOODS DECL. ¶ 7, COMPENDIUM Ex. 7.) While CALTRANS curiously maintains it has not yet approved the CURRENT PLANS (Dkt. 16 at 13), in the email quoted at the outset of this motion, OCTA's counsel has stated, "It is too late to dither about the drainage system being installed now."  (WOODS DECL. ¶ 8, COMPENDIUM Ex. 8.)  In an October 14, 2019 email, OCTA's counsel further informed PLAINTIFFS the CURRENT PLANS describe the "drainage facilities *currently being installed* adjacent to [their] properties." (WOODS DECL. ¶ 9, COMPENDIUM Ex. 9, italics added.)

Temporarily putting aside the mystery as to how the OCTA could be constructing a drainage system CALTRANS claims it has yet to approve, immediately after receiving the CURRENT PLANS (and all earlier versions), PLAINTIFFS arranged for Adams Streeter Civil Engineers, Inc. ("ADAMS STREETER") to review them.  ADAMS STREETER is a reputable Irvine-based civil engineering firm that specializes in land development civil engineering for residential, commercial, industrial, retail and public works clients.  As set forth in the accompanying declaration of ADAMS STREETER California registered civil engineer Khoon Tan, the CURRENT PLANS *will* impede stormwater drainage and *will* cause substantial flooding on the AFFECTED PROPERTY.  (TAN DECL. ¶¶ 22-33.)

More precisely, as explained in Mr. Tan's declaration, the CURRENT PLANS include a drainage sub-system identified therein as "Drainage System No. 828."  (TAN DECL. ¶ 23.)  The CURRENT PLANS show there are four (4) inlets within the AFFECTED PROPERTY that drain directly into Drainage System No. 828: *i.e.*, drainage inlets #1, #4, #5 and #6. (*Ibid.*)  Per the CURRENT PLANS, Drainage System No. 828 drains stormwater into a new detention basin that will be constructed in a vacant triangular lot adjacent to the AFFECTED PROPERTY

5

("DETENTION BASIN").  (TAN DECL. ¶ 24.)  (This triangular lot is currently being used by the OCTA as a temporary cement and debris storage and crushing facility).

The OCTA concedes, and Mr. Tan confirms, this DETENTION BASIN has been designed to *intentionally slow down and limit the amount of stormwater that drains* into downstream drainage facilities during times of peak flow. (TAN DECL. ¶ 25.)  It is also designed to allow for the settling of sedimentation by trapping and holding stormwater in the DETENTION BASIN for extended periods of time.  (*Id.*)  To accomplish both objectives, the DETENTION BASIN releases water through two "top hat" drains.  During a heavy rain event, stormwater flowing into the DETENTION BASIN will not begin to drain until the water level reaches the height of these "top hat" drains.  *By the time the water reaches the height of the "top hat" drains, however, the water elevation in the DETENTION BASIN will be substantially higher than the water elevation of inlet #1 on the AFFECTED PROPERTY*.  As a result, the flow of stormwater *will* be impeded and *will*, as a matter of simple physics, backflow and flood the AFFECTED PROPERTY.  (TAN DECL. ¶¶ 23–27.)   Albeit not the primary focus of this motion, PLAINTIFFS also believe DEFENDANTS' construction and maintenance of a *permanent pool of stagnant water* in close proximity to a densely habited area poses other self-evident risks to the environment and human health.

These are presently known adverse environmental impacts.  Yet, as explained below, *they have never been assessed or disclosed as required by NEPA*.  Rather, DEFENDANTS' apparent plan is to build this ticking time bomb, then claim PLAINTIFFS waited too long to do anything about it, pay them off with money and—in the process—constructively evict thousands of Orange County residents as well as shut down two businesses.

MEMORANDUM OF POINTS AND AUTHORITIES ISO PRELIMINARY INJUNCTION MOTION
P&As.docx/1251-017-02

**C. DEFENDANTS' First and _Only_ Environmental Analysis Does Not Consider Potential Impacts of the (then Non-Existent) CURRENT PLANS.**

The CURRENT PLANS (and all predecessor plans for the drainage sub-system) were prepared many years after CALTRANS and OCTA performed their _one and only_ analysis of the PROJECT's environmental impacts under NEPA.  To this end, CALTRANS and OCTA issued their Final Environmental Impact Report/Environmental Impact Statement ("FEIS" or "FINAL EIS") for the PROJECT on or around March 26, 2015.  (WOODS DECL. ¶ 3, COMPENDIUM Ex. 3.)  In this FEIS, DEFENDANTS acknowledge they would need to modify and replace drainage facilities in the PROJECT area "to accommodate project construction and provide sufficient drainage capacity to accommodate future runoff volumes generated with the built project in place."  (WOODS DECL. ¶ 3, Ex. 3 at 2-17.)  In the same document, DEFENDANTS vaguely assure PLAINTIFFS and the public-at-large there would not be any "adverse effects to the existing drainage pattern" and "the proposed project would not have significant and/or adverse effects to the existing drainage pattern as a result of operations."  (WOODS DECL. ¶ 3, COMPENDIUM Ex. 3 at 3.2.2-17.)  DEFENDANTS more dogmatically further state the PROJECT will not "[r]esult in a significant floodplain encroachment," "[s]ubstantially affect life and property" nor "[n]egatively affect natural and beneficial floodplain values."  (WOODS DECL. ¶ 3m COMPENDIUM Ex. 3 at S-36.)

Despite such general assurances and platitudes, _the FEIS does not specify the particular drainage facilities CALTRANS and OCTA then proposed to modify, replace and/or install near the AFFECTED PROPERTY_.  (_See_ WOODS DECL. Ex. 3 at 3.2.2-22 (listing facilities the PROJECT "may include"), App'x Q; FLEENOR DECL. ¶¶ 11-12.)  Likewise, no actual drainage plans or hydrology studies were included.  (FLEENOR DECL. ¶ 11-13.)  To the contrary, CALTRANS

7

and OCTA expressly acknowledged *future* hydraulic studies and analyses "would be necessary" to ensure the drainage facilities met applicable governmental requirements and ascertain the environmental impacts of the PROJECT'S drainage plans. (WOODS DECL. ¶ 3, COMPENDIUM Ex. 3 at 3.2.2-17; FLEENOR DECL. ¶¶ 14-15.) In other words, the FEIS provided no actual plans, or supporting studies, for PLAINTIFFS or the public to review or on which to provide comment. (FLEENOR DECL. ¶¶ 11-20.)

Since issuing the FEIS, DEFENDANTS have not publicly issued any environmental reevaluation or other assessment analyzing and disclosing the environmental impacts of the PROJECT.

As explained in the accompanying declaration of Dr. William Fleenor, to comply with "applicable governmental requirements," an environmental impact analysis must rely on current flood map information and the results of hydraulic studies and models that utilize 100-year storm event projections, as the 100-year storm criteria is the applicable standard for Orange County. (FLEENOR DECL. ¶¶ 13-20.)[1] Absent such an analysis, DEFENDANTS cannot assure PLAINTIFFS, this Court or the public the PROJECT will adequately protect the AFFECTED PROPERTY and surrounding community from flooding and environmental impacts. (FLEENOR DECL. ¶ 23-29.)

No known 100-year storm event analysis has ever been performed in connection with the drainage system now being constructed.

## III.  **STANDARD**

"A motion for preliminary injunction requires that a plaintiff show [1] that 'he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm

---

[1] Dr. Fleenor points out DEFENDANTS' CURRENT PLANS account only for a 25-year rain event, while the Orange County Public Works Department requires all newly installed stormwater drainage systems to account for a 100-year rain event. (FLEENOR DECL. ¶ 20.)

in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'"  *League of Wilderness Defenders/Blue Mts. Biodiversity Project v. Connaughton*, 752 F.3d 755, 759 (9th Cir. 2014), quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 366 (2008).  The purpose of a preliminary injunction is to "'preserve the status quo and the rights of the parties until a final judgment issues in the cause.'"  *Id.* at 767, quoting *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010).

## IV.   **ARGUMENT**

### A. Plaintiffs Are Likely to Succeed on the Merits of Their NEPA Claim.

#### 1. *DEFENDANTS Must Assess the Environmental Impacts of Their CURRENT PLANS on the AFFECTED PROPERTY*

It is axiomatic both CALTRANS and OCTA are subject to NEPA.  CALTRANS is the lead agency for the PROJECT and has assumed the responsibilities of the Federal Highway Administration ("FHWA") for environmental review, consultation, and any other action required in accordance with applicable federal laws, including NEPA, with respect to the PROJECT.  23 U.S.C. § 327. (COMPENDIUM Ex. 3 at S-1.)  The OCTA is a cooperating and responsible agency for the PROJECT.  (COMPENDIUM Ex. 3 at S-1.)  Accordingly, both CALTRANS and OCTA have authority over the PROJECT and the same environmental and administrative law standards that apply to federal agencies apply equally to CALTRANS and the OCTA.  See *Faith v. Texas Dep't of Transp.*, 924 F.3d 132, 135 n.1 (5th Cir. 2018); *Pacificans for a Scenic Coast v. Cal. Dep't of Transp.*, 204 F. Supp. 3d 1075, 1081-82 (N.D. Cal. 2016).

NEPA imposes "a continuing duty to supplement environmental documents." *Price Rd. Neighborhood Ass'n v. United States Dep't of Transp.*, 113 F.3d 1505, 1509 (9th Cir. 1997).  "'When new information comes to light the agency must consider it, evaluate it, and make a reasoned determination whether it is of such significance as to require [a supplemental EIS].'"  *Friends of the Clearwater v.*

*Dombeck*, 222 F.3d 552, 558 (9th Cir. 2000), quoting *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1024 (9th Cir. 1980).  NEPA's implementing regulations require agencies to supplement environmental impact statements if: "(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(i)–(ii).  Here, both prongs are met.

First, DEFENDANTS have undeniably made "substantial changes" to the PROJECT in the four years since they issued the FEIS.  *See* 40 C.F.R. § 1502.9(c)(1)(i).  Namely, they designed and released the CURRENT PLANS. They also prepared and revised predecessor plans on which the CURRENT PLANS are based after issuing the FEIS.  Since no such plans existed when the FEIS issued, it is self-evident they could not have been then considered or evaluated.  The drainage system DEFENDANTS have since designed, then redesigned and are now constructing, are plainly relevant to environmental concerns insofar as they dictate how stormwater drainage will be handled, thus whether flooding will occur. (FLEENOR DECL. ¶ 21-22.)

Second, "significant new circumstances [and] information" have arisen since DEFENDANTS issued the FEIS demonstrating the CURRENT PLANS will impede stormwater drainage and cause flooding.  *See* 40 C.F.R. § 1502.9(c)(1)(ii). Again, the FEIS issued years *before* DEFENDANTS prepared drainage plans for the PROJECT (WOODS DECL. ¶¶ 3, 5, COMPENDIUM Exs. 3 & 5; (FLEENOR DECL. ¶ 18-19); *before* DEFENDANTS prepared the CURRENT PLANS (WOODS DECL. ¶¶ 3, 7, COMPENDIUM Exs. 3, 7); *before* DEFENDANTS prepared and revised predecessor plans (WOODS DECL. ¶¶ 3, 6, COMPENDIUM Exs. 3, 6); *before* DEFENDANTS conducted the hydraulic studies and models the FEIS stated would be necessary (WOODS DECL. ¶ 3, COMPENDIUM Ex. 3 at 3.2.2-17; (FLEENOR DECL. ¶ 13-22); and *before* receiving the reports from

MEMORANDUM OF POINTS AND AUTHORITIES ISO PRELIMINARY INJUNCTION MOTION

ADAMS STREETER showing the CURRENT PLANS *will* impede drainage and cause substantial flooding on the AFFECTED PROPERTY (TAN DECL. ¶¶ 18–19, Exs. 20 & 21).

Despite this overwhelming showing of "significant new circumstances [and] information", the Ninth Circuit has recognized meeting this second prong of 40 C.F.R. § 1502.9(c)(1) "is a low standard." *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006).  PLAINTIFFS "'need not show that significant effects *will in fact occur*'"; instead, PLAINTIFFS need only show "'substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor.'"  *Ibid.*, quoting *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149–50 (9th Cir. 1998)); see also *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 732 (9th Cir. 1995) ("'A determination that significant effects on the human environment will in fact occur is not essential'"), quoting *Sierra Club v. United States Forest Serv.*, 843 F.2d 1190, 1193 (9th Cir. 1988).

The Ninth Circuit's decision in *Klamath* is illustrative and on-point.  There, the Bureau of Land Management ("BLM") amended a forest management plan, prepared a final supplemental environmental impact statement and later, under the amended plan, downgraded the protections of the red tree vole.  As here—where DEFENDANTS issued their FEIS years before preparing the CURRENT PLANS then commenced actual construction of the drainage system near the AFFECTED PROPERTY without an environmental reevaluation or supplemental environmental impact statement—the BLM "fail[ed] to conduct an EIS prior to implementing either of the [animal species review] Decisions, [and] it did not even conduct an [environmental assessment]."  *Klamath*, 468 F.3d at 562.  The Ninth Circuit rejected the BLM's reliance on an environmental impact statement prepared when the forest management plan was amended because the subsequent decision to downgrade the red tree vole was "based on a pool of data 80% of which was not

11

available when the 2000 FSEIS was created." *Id.* at 561. In so doing, the Ninth Circuit held the BLM's "animal species review" decisions invalid under NEPA.

In the same way BLM tried to circumvent NEPA, DEFENDANTS rely on the general statements and platitudes in their outdated FEIS: *i.e.*, conclusory statements to the effect the PROJECT'S "impacts to stormwater facilities would be less than significant"; there would not be any "adverse effects to the existing drainage pattern"; "the proposed project would not have significant and/or adverse effects to the existing drainage pattern as a result of operations"; the PROJECT would not "[r]esult in a significant floodplain encroachment," "[s]ubstantially affect life and property" nor "[n]egatively affect natural and beneficial floodplain values." They do so even though the CURRENT PLANS themselves, together with the Mr. Tan's analysis, show the drainage system now being constructed *will* impede drainage, *will* cause flooding and *will* produce other adverse environmental impacts DEFENDANTS fail to acknowledge or disclose in the FEIS.

Since DEFENDANTS did not have their CURRENT PLANS, much less ADAMS STREETER or Mr. Tan's input back in 2015, they are in fact proceeding with construction "on a pool of data" *100% of which* was not available when the 2015 FEIS was created.

### 2. Where Information in An Initial EIS Was So Incomplete or Misleading That the Decisionmaker or the Public Could Not Make an Informed Comparison of the Alternatives, A Supplemental EIS Is Necessary

"Where the information in the initial EIS was so incomplete or misleading that the decisionmaker and the public could not make an informed comparison of the alternatives, revision of an EIS may be necessary to provide a reasonable, good faith, and objective presentation of the subjects required by NEPA.") *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1439 (9th Cir. 1988) (internal quotation marks omitted, amended by 867 F.2d 1244 (9th Cir. 1989)), citing *Johnston v. Davis*, 698 F.2d 1088, 1095 (10th Cir. 1983) (revision of EIS necessary where use of

artificially low discount rate resulted in unreasonable comparison of alternatives to proposed project); see also *National Wildlife Federation v. Andrus*, 440 F. Supp. 1245, 1254 (D.D.C. 1977) (EIS deficient where several alternatives were not treated in the EIS and the EIS did not set forth reasons why these alternatives were rejected).

Here, as explained by Dr. Fleenor, DEFENDANTS' statements in their FEIS regarding the then yet-to-be designed drainage system "at best … amount[ed] to aspirational statements of future intent" and were "not based on known facts or scientifically relevant data …."  (FLEENOR DECL. ¶ 23.)  Likewise, not only did DEFENDANTS' one and only FEIS fail to set forth reasons why the drainage sub-system now under construction was chosen, or compare that choice with other alternatives, it failed to include any discussion of drainage system design or possible choices.  Accordingly, "a revision [is] necessary to provide a reasonable, good faith, and objective presentation" of the choices and their environmental consequences.

### 3.   *Although an Agency's Decision is Reviewed Under an Abuse of Discretion Standard, Under NEPA the Court Must Decide Whether the Agency Took A "Hard Look" at the Environmental Consequences of its Proposed Actions and Reasonably Evaluated the Relevant Facts*

As explained by this Court in B*everly Hills Unified Sch. Dist. v. Fed. Transit Admin.*, No. CV 12-9861-GW(SSx), 2016 U.S. Dist. LEXIS 192573, at *167-70 (C.D. Cal. Feb. 1, 2016):

> "[A]n EIS is adequate if it 'contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences.' " *Montana Snowmobile Ass'n*, 790 F.3d at 924 (quoting *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004)); see also *Ctr. for Biological Diversity*, 349 F.3d at 1166 (referencing a "rule of reason [standard]").  "Although the adequacy of an EIS is reviewed

13

for 'reasonableness' and [a] no-supplemental-EIS determination for 'abuse of discretion,' the standards are the same." *California ex rel. Imperial Cnty.*, 767 F.3d at 792; *Ctr. for Biological Diversity*, 349 F.3d at 1166. "Under either rubric, [a court] must decide whether the [agency] took a 'hard look' at the environmental consequences of the proposed actions and reasonably evaluated the relevant facts." *Id*. However, "[t]o take the required 'hard look' at a proposed project's effects, an agency may not rely on incorrect assumptions or data in an EIS." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005); see also *Montana Snowmobile Ass'n*, 790 F.3d at 927 (ruling that "NEPA requires more" than asking a court "to assume the adequacy and accuracy of partial data without providing any basis for doing so").

Here, DEFENDANTS cannot withstand the "hard look" test because they never, in a NEPA required environmental impact statement or otherwise, explained their choice of the drainage sub-system now being installed—a drainage sub-system guaranteed to flood large portions of the AFFECTED PROPERTY.  Nor can they demonstrate the adequacy of "partial data" justifying their choice of drainage system given the *total absence of such data* in the FEIS.  (FLEENOR DECL. ¶ 11-16.)

### 4. DEFENDANTS Must Assess the Environmental Impacts of Their CURRENT PLANS *Before* Constructing the Drainage System

"NEPA requires an agency to take a 'hard look' at the potential environmental consequences of proposed projects *before* taking action." *Price Rd. Neighborhood Ass'n*, *supra*, 113 F.3d at 1509  (emphasis added).  The Ninth Circuit has explained NEPA environmental assessments "'must be prepared *early enough* so that they can serve practically as an important contribution to the decision making process and will not be used to rationalize or justify decisions

already made.'" *Idaho Sporting Congress, Inc. v. Alexander*, 222 F.3d 562, 567 (9th Cir. 2000) (emphasis added), quoting *Save the Yaak Comm. v. Block*, 840 F.2d 714, 718 (9th Cir. 1988).  "'The phrase early enough means at the earliest possible time to insure that planning and decisions reflect environmental values.'"  *Id.* at 568 (holding the Forest Service violated NEPA because "at the time the Forest Service originally approved the timber sales, it did not have available all the information and analysis" necessary), quoting *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000); see also *Metcalf*, 214 F.3d at 1145 (holding federal agencies violated NEPA by making a "firm commitment" to support whaling before preparing an environmental assessment).

Like the Forest Service in *Idaho Sporting Congress*, here DEFENDANTS issued their FEIS before they had a complete set of data: *i.e.*, on its face the FEIS concedes DEFENDANTS needed, among other things, future hydrology and hydraulic studies to determine the proper drainage facilities for the PROJECT. (FLEENOR DECL. ¶ 12-16; COMPENDIUM Ex. 3 at 3.2.2-16 & 3.2.2-17.)

As common-sense extension of this "early enough" rule, the Ninth Circuit has also held an agency must complete an environmental assessment based on "significant new circumstances [and] information" *before* beginning construction. See *Save the Yaak Comm.*, *supra*, 840 F.2d at 718-19 (Forest Service violated NEPA's timing requirements because "construction had already begun" before the environmental assessments were prepared); *Thomas v. Peterson*, 753 F.2d 754, 760 (9th Cir. 1985) (Forest Service required to comply with NEPA before constructing a road to facilitate proposed timber sales because "[b]uilding the road swings the balance decidedly in favor of timber sales even if such sales would have been disfavored had road and sales been considered together before the road was build"). Yet, as in *Save the Yaak*, DEFENDANTS have admittedly "already begun" constructing the drainage system the OCTA says it is "too late to dither about."

### 5. *Allowing DEFENDANTS to Build While Ignoring Potentially Harmful Environmental Impacts Until After They Occur Flouts the Very Purpose of NEPA*

Without conducting the statutorily mandated reevaluation and supplementation of their FEIS to account for environmental impacts of their subsequently devised drainage system based on subsequently derived facts and information, "the public w[ill] be at risk of [DEFENDANTS] proceeding on mistaken assumptions." *League of Wilderness Defenders*, 752 F.3d at 761 (enjoining a logging project because Forest Service withdrew a "travel management plan" for the project area and, as a result, "a supplemental EIS must be completed to show the environmental impact of the [project] on elk and their habitat now that the [travel management plan] has been withdrawn").

Put another way, by proceeding based on an outdated and facially deficient FEIS, and ignoring potentially harmful environmental impacts until after they occur, DEFENDANTS flout the very purpose of NEPA. As our Supreme Court put it:

> NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct. Similarly, the broad dissemination of information mandated by NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time.

*Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 371 (1989).

### B. PLAINTIFFS Will Suffer Irreparable Harm Without an Injunction.

As set forth in the accompanying declarations of Dr. Fleenor and Mr. Tan, as matter of simple physics the drainage system DEFENDANTS are *now installing* based on the CURRENT PLANS *will* impede drainage and *will* cause flooding. This imperils the safety of thousands of residents, dozens of employees and the viability of two businesses.

MEMORANDUM OF POINTS AND AUTHORITIES ISO PRELIMINARY INJUNCTION MOTION
P&As.docx/1251-017-02

It cannot be reasonably contested that the potentially catastrophic harm of property flooding is irreparable. *Lands Council v. McNair*, 537 F.3d 981, 1004 (9th Cir. 2008) ("[T]he Supreme Court has instructed us that 'environmental injury, by its nature, can seldom by adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.'"), quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).  Accordingly, PLAINTIFFS face irreparable injury if immediate preliminary injunctive relief is not ordered.

### C. The Balance of Equities Weigh in PLAINTIFFS' Favor.

Balancing the equities "requires a comparison between the irreparable environmental harms" of the PROJECT, on the one hand, "and the economic interests" of DEFENDANTS, on the other hand.  *League of Wilderness Defenders*, 752 F.3d at 765.

Here, DEFENDANTS are currently installing a *permanent* drainage system that exposes the AFFECTED PROPERTY and the thousands of residents who live on it to a constant threat of flooding whenever it rains.  Accordingly, PLAINTIFFS and their tenants face permanent environmental harm.  DEFENDANTS, however, face only a temporary delay in their ability to complete one small segment of the overall 16-mile long PROJECT.  Where one side faces permanent environmental harm and the other side only temporary delay, the Supreme Court and Ninth Circuit have consistently held the balance of equities weigh in favor of the party facing permanent environmental harm.  See *Amoco*, 480 U.S. at 545 ("If such [irreparable environmental] injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."); *League of Wilderness Defenders*, 752 F.3d at 765 ("[W]e conclude that the balance of equities tips toward the LOWD plaintiffs, because the harms they face are permanent, while the intervenors face temporary delay.").  Accordingly, the balance of equities weigh

in PLAINTIFFS' favor.

### D. A Preliminary Injunction Is in the Public Interest.

"'The public interest inquiry primarily addresses impact on non-parties rather than parties.'" *League of Wilderness Defenders*, 752 F.3d at 766 (quoting *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002)).

Here, the public interest would be harmed because the environmental impacts of the CURRENT PLANS not only affect PLAINTIFFS, but thousands of residents, dozens of employees and a commercial tenant (aside from PLAINTIFFS' own nearly 50-year old business).  The environmental harm is imminent because the rain season is close at hand.  Accordingly, mitigating the harmful (and potentially catastrophic) environmental risks is a valid public interest.  See *Sammartano*, *supra*, 303 F.3d at 974. (mitigating the risks of fire and insect infestation "is a valid public interest").

### E. PLAINTIFFS Exhausted Every Effort to Avoid the Need for this Motion.

Since learning of DEFENDANTS' intent to condemn a portion of the AFFECTED PROPERTY as a part of their overall construction plans, PLAINTIFFS, through counsel, attempted to engage the OCTA, and ultimately both the OCTA and CALTRANS, in a cooperative dialog to understand and avoid the perils described herein.  (WOODS DECL. ¶¶ 10-13, COMPENDIUM Exs. 10-13.)  As a result of those proactive efforts, PLAINTIFFS finally convinced the OCTA to disclose DEFENDANTS' initial plans for the drainage system adjacent to the AFFECTED PROPERTY.  (WOODS DECL. ¶ 14.)  As stated above, on January 7, 2019, OCTA provided PLAINTIFFS with DEFENDANTS' initial plans for the drainage system adjacent to the AFFECTED PROPERTY. (*Id.*)   Shortly thereafter, PLAINTIFFS provided ADAM STREETER's comments regarding the

proposed drainage plans to counsel for OCTA .  (WOODS DECL. ¶ 15, COMPENDIUM Ex. 14.)

Since receiving those comments, the OCTA reportedly made multiple revisions to its drainage plans (revisions ADAMS STREETER concludes will not avoid or materially reduce flooding). (WOODS DECL. ¶ 16, COMPENDIUM Exhibits 6, 7, 9.) PLAINTIFFS thereafter suggested, and the OCTA ultimately agreed to allow, a face-to-face meeting to include the OCTA's engineers and ADAMS STREETER. (WOODS DECL. ¶ 17.)  In response to this input from PLAINTIFFS and ADAMS STREETER, the OCTA acknowledged its initially disclosed plans relied, at least in part, on faulty assumptions and incomplete data. (WOODS DECL. ¶ 18.)  The OCTA thereafter sought and received PLAINTIFFS' permission to conduct a physical survey on the AFFECTED PROPERTY to determine the elevation differential between the "top hat" drains described above and the lowest level/drain on the AFFECTED PROPERTY (WOODS DECL. ¶ 19.)

Concerned about the upcoming rainy season and DEFENDANTS' destruction/removal of the former drainage system, on or about October 4, 2019, PLAINTIFFS' counsel again reached out to OCTA's counsel by telephone to propose a further meeting among the parties' civil engineers.  The purpose for the second proposed meeting was to understand DEFENDANTS' plan, if any, for the installation of interim measures to avoid imminent flooding for the 2019/2020 wet season.  (WOODS DECL. ¶ 20.)  On October 9, 2019, OCTA's counsel responded with the "it's too late to dither about the drainage system being installed now" email quoted above.  (COMPENDIUM Ex. 8.)  While saying "as a practical matter" it was too late to "change the course of the design currently being implemented," the OCTA failed to provide PLAINTIFFS a copy of the design, or plans, then under construction.  (WOODS DECL. ¶ 21.)

At approximately this same time, CALTRANS, through its counsel, asked PLAINTIFFS to stipulate to stay this action while CALTRANS continued to study

the matter to determine whether further compliance with NEPA was required. The stay was estimated to last through the duration of 2019, well into the wet season. (WOODS DECL. ¶ 22.)  During a telephone call on October 9, 2019, PLAINTIFFS' counsel responded to CALTRANS' counsel, that PLAINTIFFS would be willing to stipulate, provided the parties reach agreement on a temporary drainage plan to avoid flooding for the 2019-2020 wet season. (WOODS DECL. ¶ 23.)  PLAINTIFFS' counsel also told CALTRANS about the above-described exchange with the OCTA, the OCTA's "too late to dither" response, and the OCTA's failure to provide PLAINTIFFS' with the OCTA's plans or "design currently being implemented."  CALTRANS' counsel agreed PLAINTIFFS should receive those plans.  (WOODS DECL. ¶ 24.)  Without further prompting, on October 14, 2019, PLAINTIFFS received the CURRENT PLANS from the OCTA. (WOODS DECL. ¶ 25, COMPENDIUM Ex. 9.)  When, shortly thereafter, ADAMS STREETER advised PLAINTIFFS the CURRENT PLANS are simply one component of DEFENDANTS' earlier plans, expected to result in widespread flooding, PLAINTIFFS declined CALTRANS' request to stipulate to a stay and commenced drafting this motion. (WOODS DECL. ¶ 26.)

PLAINTIFFS have at all times acted diligently and with clean hands. DEFENDANTS have responded with delay and seeming bureaucratic indifference.

**F. The Court Should Not Impose a Bond.**

"Courts routinely impose either no bond or a minimal bond in public interest environmental cases." *City of South Pasadena v. Slater*, 56 F. Supp. 2d 1106, 1148 (C.D. Cal. 1999) (granting preliminary injunction prohibiting defendants from expending federal or state funds on the 710 Freeway construction project, and declining to require a bond, where plaintiffs demonstrated a likelihood of success on the merits of their claim that defendants inappropriately failed to complete a supplemental EIS) (citing *People ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir.), *modified on other grounds*, 775 F.2d 998

(9th Cir. 1985)).  This is plainly a public interest environmental case affecting the health and well-being of thousands of Orange County residents; therefore, for the reasons explained in *Slater*, either no bond or a minimal bond should be imposed.

## **CONCLUSION**

For the reasons set forth above and in the accompanying declarations of Dr. Fleenor, Mr. Tan, Mr. Sublett and counsel Woods, PLAINTIFFS respectfully request that the Court enjoin DEFENDANTS from continuing construction of the permanent drainage system described in their CURRENT PLANS pending DEFENDANTS' compliance with their statutory duty to complete a supplemental environmental assessment based on "significant new circumstances [and] information" that been brought to their attention since the FEIS issued. PLAINTIFFS further respectfully request that the Court order DEFENDANTS to immediately devise and put a plan in place to prevent likely flooding (*e.g.*, provide for the prompt deployment of emergency pumping equipment, hoses, etc.) while this environment impact assessment is in progress.

Dated: November 19, 2019      ENTERPRISE COUNSEL GROUP
         A Law Corporation


By:    /S/ Anjuli B. Woods
      David A. Robinson
      Anjuli B. Woods
      Eric G. Salbert
      Thomas S. Van

Attorneys for Plaintiffs

MEMORANDUM OF POINTS AND AUTHORITIES ISO PRELIMINARY INJUNCTION MOTION
P&As.docx/1251-017-02