WOODRUFF, SPRADLIN & SMART, APC
GARY C. WEISBERG - State Bar No. 132092
gweisberg@wss-law.com
LAURA A. MORGAN - State Bar No. 202745
lmorgan@wss-law.com
RICIA R. HAGER - State Bar No. 234052
rhager@wss-law.com
555 Anton Boulevard, Suite 1200
Costa Mesa, California 92626-7670
Telephone:  (714) 558-7000
Facsimile:   (714) 835-7787

Attorneys for Defendant ORANGE COUNTY TRANSPORTATION
AUTHORITY, a public entity

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| M. WESTLAND, LLC, a Delaware limited liability company; DOROTHY SUBLETT-MILLER and WALTER J. MILLER, Successor Trustees of the Miller Family Trust, originally dated October 12, 1979, Amended and restated February 05, 2004, for the Estate of Willis L. Miller, deceased, as to an undivided ½ interest; DOROTHY SUBLETT-MILLER and WALTER J. MILLER, Successor trustees of the Miller Family Trust, originally dated October 12, 1979, Amended and Restated February 05, 2004, for the Estate of Dorothy M. Miller, deceased, as to an undivided ½ interest; and LAND PARTNERS, LLC, a California limited liability company formerly known as LAND PARTNERS CO., LTD, <br><br> Plaintiffs, <br> v. <br><br> CALIFORNIA DEPARTMENT OF TRANSPORTATION, a public entity; LAURIE BERMAN, in her official capacity as Director, California Department of Transportation; and ORANGE COUNTY TRANSPORTATION AUTHORITY, a public entity, <br><br> Defendants. | CASE NO.: 8:19-cv-01661 JVS (KESx) <br><br> BEFORE THE HONORABLE JAMES V. SELNA COURTROOM 10C <br><br> **DEFENDANT ORANGE COUNTY TRANSPORTATION AUTHORITY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> HEARING DATES PENDING: <br> Type: OCTA's Motion to Dismiss <br> Date: February 10, 2020 <br> Time: 1:30 p.m. <br> Ctrm: 10C <br><br> Type: CALTRANS' Motion to Dismiss <br> Date: February 10, 2020 <br> Time: 1:30 p.m. <br> Ctrm: 10C <br><br> Type: Plaintiffs' Motion for Preliminary Injunction <br> Date: February 10, 2020 <br> Time: 1:30 p.m. <br> Ctrm: 10C |

1467947.1

1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

Defendant ORANGE COUNTY TRANSPORTATION AUTHORITY, a public entity ("OCTA") submits the following memorandum of points and authorities in opposition to Plaintiffs' motion for preliminary injunction.

DATED:  January 20, 2020          WOODRUFF, SPRADLIN & SMART, APC

By: *s/Ricia R. Hager*_____
    GARY C. WEISBERG
    LAURA A. MORGAN
    RICIA R. HAGER
    Attorneys for Defendant ORANGE COUNTY
    TRANSPORTATION AUTHORITY, a public
    entity

1467947.1

1

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

## TABLE OF CONTENTS

1. INTRODUCTION ........................................................................6
2. STATEMENT OF FACTS ..........................................................7
   A. The $1.9 Billion I-405 Project is Critical to Address Congestion ........7
   B. Caltrans Carefully Reviewed the Project's Environmental Impacts ....9
   C. OCTA Awarded a Design-Build Contract in November 2016............9
   D. Status of Drainage Facilities in ROW Property ..................................10
   E. A State Court Rejected Plaintiffs' Similar Arguments ......................12
3. STANDARD - MANDATORY INJUNCTIONS ARE DISFAVORED .....13
4. PLAINTIFFS ARE UNLIKELY TO PREVAIL ON THE MERITS..........14
   A. Criticisms of the EIS Are Four Years Too Late ..................................14
   B. The Temporary Drainage Facilities Comply With the EIS ................15
   C. The Supplemental Environmental Review Claims Are Not Ripe ......16
   D. No Supplemental Environmental Review Is Required ......................16
   E. The Requested Relief is Nonsensical....................................................17
5. THERE IS NO EVIDENCE OF IRREPARABLE HARM ..........................18
   A. The New Facilities Have and Will Improve Pre-Project Conditions .18
   B. The Detention Basin Will Not Be Constructed Until 2022 ................19
   C. The Alleged Harm is Self-Inflicted......................................................19
   D. The Motion's Alleged Facts Are Incorrect ..........................................21
   E. Plaintiffs Can Mitigate the Purported Harm ......................................22
   F. Plaintiffs Waited Since at Least 2018 to Seek Injunctive Relief........22
6. AN INJUNCTION IS NOT IN THE PUBLIC INTEREST ..........................23
   A. The Project's Environmental Benefits Should Not Be Delayed.........23
   B. Project Delay at This Location Could Cost $140,000 Per Day ..........23
   C. Plaintiffs Are Forum Shopping ..........................................................24
7. A BOND IS APPROPRIATE TO ENJOIN A $1.9 BILLON PROJECT ....24
8. CONCLUSION ...........................................................................25

1

## TABLE OF AUTHORITIES

2

**FEDERAL CASES**

3  *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531 (1987) ....................................18

4  *Anderson v. United States*, 612 F.2d 1112 (9th Cir. 1980) ..........................................13

5  *Caribbean Marine Services Co., Inc. v. Baldrige* 844 F.2d 668 (9th Cir. 1988)...18, 19

6  *Castellanos v. Countrywide Bank*, 2015 WL 1906074, *6 (N.D. Cal. 2015) ..............24

7  *Chlorine Institute, Inc. v. Soo Line R.R.*, 792 F.3d 903 (8th Cir. 2015)......................22

8  *Earth Island Inst. v. Carlton,* 626 F.3d 462 (9th Cir. 2010).................................13, 14

9  *Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015) .............................................14, 22

10  *Great Basin Mine Watch v. Hankins*, 456 F.3d 955 (9th Cir. 2006) ...........................14

11  *Highland Village Parents Group v. U.S. Fed. Highway Admin.*,

12       562 F.Supp.2d 857 (E.D. Tx. 2008) .......................................................................14

13  *Martin v. International Olympic* Committee, 740 F.2d 670 (9th Cir. 1984)...............14

14  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) .....................................18

15  *Nken v. Holder,* 556 U.S. 418 (2009) ..........................................................................23

16  *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374 (9th Cir. 1985) .........22

17  *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976 (9th Cir. 2011)....................................19

18  *River Runners for Wilderness v. Martin*, 593 F.3d 1064 (9th Cir. 2010)....................14

19  *Russell County Sportsmen v. U.S. Forest Service*, 668 F.3d 1037 (9th Cir. 2011).......17

20  *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) ........................13, 23

21  **FEDERAL STATUTES**

22  23 U.S.C. section 139(l)(1)............................................................................................14

23  5 U.S.C. section 704 ......................................................................................................14

24  Federal Rule of Civil Procedure 65(c)..........................................................................25

25  **STATE STATUTES**

26  Code of Civil Procedure section 1255.410....................................................................13

27

28

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

1467947.1

1

**<u>REGULATIONS</u>**

2

80 Fed.Reg. 31,948 (June 4, 2015) ...........................................................................9, 14

3

**<u>OTHER</u>**

4

Rutter Guide to Federal Civil Procedure Before Trial, § 13.56.1 (2019) ....................19

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

1467947.1

5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## 1.   <u>INTRODUCTION</u>

Plaintiffs tell a wild tale of government agencies run amok, constructing drainage facilities without obtaining necessary approvals or conducting hydrology studies.  Plaintiffs claim that they provided Defendant Orange County Transportation Authority ("OCTA") with an engineering report that said these facilities will cause widespread flooding, and that OCTA's contractor is building those facilities anyway. Plaintiffs grossly misstate the facts and Plaintiffs' engineering report is simply wrong.

Defendants OCTA and California Department of Transportation ("Caltrans") are near the halfway mark of a $1.9 billion improvement project to widen the I-405 freeway throughout Orange County ("Project").  Plaintiffs M. Westland, LLC, Land Partners, LLC, Dorothy Sublett-Miller (as successor trustee), and Walter J. Miller (also as successor trustee) (collectively "Plaintiffs") own real property adjacent to the I-405 Freeway in the City of Westminster ("Adjacent Properties").  Historically, an open V-ditch or trapezoidal channel within Caltrans right of way ("ROW Property") collected storm water runoff from the freeway, a freeway off-ramp and the Adjacent Properties.  The Project proposes to replace the V-ditch with enclosed pipe.  Plaintiffs challenge the proposed design for the permanent drainage facilities and the temporary drainage facilities that have been installed to provide drainage during construction.

Defendants will provide drainage to Plaintiffs' property that is equivalent to the drainage that was provided pre-Project.  OCTA worked with Plaintiffs to obtain more information about the amount of watershed being delivered to the pre-Project drainage system, and OCTA's contractor has modified its plans to increase the drainage system's capacity.  Those plans will be reviewed by Caltrans.

Plaintiffs are not satisfied with the proposed plans because they want Defendants to fix the defective drainage system on *their* property, which has caused historic flooding for over 40 years, long before any Project-related work began.  And this is what this case is about: Plaintiffs' effort to have public tax dollars pay to fix a

1467947.1

problem of their own creation.

As set forth in the pending motions to dismiss, Plaintiffs' claims in this case are premature because they challenge preliminary drainage plans, not a final action. But even ignoring the preliminary nature of the plans under attack, Plaintiffs cannot establish a likelihood of success on the merits. Plaintiffs must prove that Caltrans failed to timely prepare a supplement to the final Environmental Impact Report ("EIS"), and the facts have not triggered such an obligation.

Additionally, Plaintiffs' claims of irreparable and imminent harm are unfounded hyperbole. Permanent drainage facilities have not been installed; the designs for the permanent facilities must first be approved by Caltrans. In the meantime, temporary drainage facilities have been installed in compliance with the EIS mitigation measures. Those temporary facilities have capably provided Plaintiffs with drainage since October 2019, including the heavy rains that occurred in December. And OCTA's expert hydrologist has concluded that the facilities will continue to do so. Indeed, OCTA's hydrologist reports that "flooding risk on the Adjacent Properties is REDUCED by the temporary drainage system." Moreover, Plaintiffs' biggest criticism of the designs for the proposed permanent drainage system relate to a mandatory water quality detention basin. Yet, the detention basin cannot be installed until long after the trial in this case. All other factors appropriately considered weigh in favor of denial of a preliminary injunction.

## 2.  STATEMENT OF FACTS

### A.  The $1.9 Billion I-405 Project is Critical to Address Congestion

OCTA coordinates the operation of all public transportation services within Orange County. (Pub. Util. Code, §§ 130250). OCTA provides multiple public service functions related to transportation and mobility. Additionally, OCTA administers rail, freeway, street, and road improvement projects throughout the

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

1   county.  (Ex. O, pp. 251-252.[1])

2          Over 20 years ago, Caltrans and OCTA identified deficiencies in the I-405's

3   operations within Orange County, one of the most heavily traveled corridors in the

4   State if not the Country.  Among other things, existing traffic demand exceeded the

5   freeway's available capacity during peak travel times.  As a result, sections of the

6   freeway operated at unacceptable levels of traffic congestion, resulting in additional

7   pollutant emissions and lost time and productivity.  These traffic conditions were

8   projected to get worse in the future.  In response, Caltrans and OCTA launched a 15-

9   year planning process to address these issues.  (Ex. N, pp. 186-203.)

10         That planning process resulted in the Project, which will improve 16 miles of

11  the I-405 between the State Route 73 freeway in Costa Mesa and the I-605 near the

12  Los Angeles County line.  The Project includes the addition of two lanes in each

13  direction, 18 bridge replacements plus new and widened bridges, interchange

14  reconfigurations, merging lane improvements, arterial street improvements, new and

15  replacement soundwalls, new bike lanes and sidewalks.  (Ex. N, pp. 188-189, Ex. O,

16  pp. 263-264.)

17         The total Project cost is $1.9 billion which will be funded by a number of

18  Federal, State and local sources.  These include: $1.135 billion from the local OC Go

19  sales tax fund (Measure M-2); $90 million in State funds; $46 million in Federal

20  funds; and $629 million in Federal Transportation Infrastructure Finance and

21  Innovation Act (TIFIA) loan funds.  (Ex. O, pp. 264-265),.  The Project will create

22  more than 40,000 jobs during the entire life of the Project.  (Ex. O, p. 273.)

23         The Project will improve air quality and safety.  (Ex. N, p. 204.)  And while

24  greenhouse gas (GHG) emissions are expected to increase regionally, due to reduced

25  congestion and more efficient operations, the Project will result in an overall reduction

26

27  [1] Exhibits M through O are the subject of OCTA's Request for Judicial Notice
    ("RJN"), filed and served separately.  All exhibits referenced herein, including those
28  in the RJN, are attached to accompanying OCTA's Compendium of Evidence
    ("Compendium").

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

1467947.1

in GHG emissions.   (Ex. N, pp. 243-245.)   The Project will provide safety improvements by reducing congestion-related collisions on the I-405; off-ramp back-up onto the I-405; and on-ramp back-up onto arterial streets.  (Ex. N, p. 200.)

### B.    Caltrans Carefully Reviewed the Project's Environmental Impacts

Environmental review of the Project began in 2009.  The Draft Environmental Impact Report/Environmental Impact Statement (EIR/EIS) was completed in 2012. In 2013, a Supplemental EIR/EIS was prepared.  The Final EIR/EIS was prepared in 2015.  Caltrans approved the Project and signed the Record of Decision on May 15, 2015.  (Ex. N, p. 188.)

On June 4, 2015, the Federal Highway Administration published its "Notice of Final Federal Agency Actions on Proposed Highway in California" regarding the Project in the Federal Register (the "Notice").  (80 Fed.Reg. 31,948 (June 4, 2015).) The Notice stated that all claims regarding the Project were barred unless filed by November 2, 2015.  (Ex. M.)

Plaintiffs allege that the EIS is outdated and that no further environmental review has been undertaken since 2015.  This is false.  Since the Final EIR/EIS was approved in 2015, Caltrans has prepared 23 environmental reevaluations pursuant to 23 C.F.R. Section 771.129.  (Dkt. 43-1: 5:8-9.)

### C.    OCTA Awarded a Design-Build Contract in November 2016

Caltrans owns and operates the I-405.  OCTA is the Project sponsor and primary funding agency.  (Declaration of Jeff Mills, 5:21-22.[2])   As the Project sponsor, OCTA awarded a design-build contract to OC 405 Partners (sometimes "contractor" or "design-builder") in November 2016.  (*Id*. at 5:22-28.)   Under a design-bid-build method, the government agency prepares complete designs for the project before soliciting bids for the construction work.  (*Id*. at 6:1-7.)

Under the design-build process, a public agency prepares preliminary design

---

[2] The declarations of Jeff Mills, Enrique Alonso, P.E., Theodore V. Hromadka II, Ph.D, and Gary C. Weisberg are attached to the Compendium.

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

9

plans before advertising for bids.  (*Id.* at 6:14-15.)  Companies bidding on the Project are required to submit bids with fixed costs for both the completion of the design and the construction work.  (*Id.* at 6:15-17.)  The design-build method was selected to reduce costly change orders and expedite the Project's completion because construction can start on early phases of the Project while design work is still being undertaken on later phases.  (*Id.* at 6:17-23.)  Design-build is an approved method of project delivery and is consistent with NEPA.  (See, e.g., 23 CFR §§636.105 and 636.109.)

Under OCTA's contract, the design builder is responsible for design and construction of the temporary and permanent drainage facilities necessary for the Project.  (*Id.* at 6:24-26.)  The contract specifically requires the design builder to "[p]rovide drainage facilities to accommodate construction staging and to accommodate runoff during all stages of construction.  All drainage systems shall be operational at all times."  (Ex. A, p. 31.)

### D.   Status of Drainage Facilities in ROW Property

Final design plans relating to the permanent drainage systems for the ROW Property were approved and released for construction in December 2018.  (Mills decl., 7:17-19.)   In or about February 2019, OCTA became aware that the Adjacent Properties were experiencing flooding related to one or more flood events.  (*Id.* at 8:2-4.)   The design-builder undertook additional analyses of the watershed.   Those analyses prompted the design-builder to propose an increase in the permanent drainage facilities' capacity.  (*Id.* at 8:4-8.)  The design-builder submitted a Notice of Design Change, No. 044 ("NDC 044") for review.   NDC 044 is currently under review and has not yet been approved.  (*Id.* at 8:7-8.)

In accord with the contract, the design-builder installed temporary drainage facilities on the ROW Property in October 2019 ("October Facilities").  (Mills decl., 8:9-10; Alonso decl., 13:4-5.)   Exhibit C to OCTA's Compendium of Evidence ("Compendium") is a depiction of the temporary drainage facilities that were installed

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

in October 2019.  These temporary drainage facilities, in many respects, mirror the drainage facilities in NDC 044, but these temporary facilities have been installed at the contractor's risk that the facilities may need to be replaced if NDC 044 is not approved.  (Mills decl., 8:9-20.)  The October Facilities provided drainage through approximately January 14, 2020.  (*Id*. at 8:21-24.)

On or about January 14, 2020, as planned, the design-builder demolished the Valley View/Garden Grove Boulevard off-ramp as part of the full ramp closure that is needed to complete the Project.  (*Id*.)  When the off-ramp was demolished, some of the October Facilities were necessarily removed.  (*Id*.)  The drainage facilities in the ROW Property are being modified to accommodate the new conditions.  (*Id*. at 8:24-28.)  Most of the October Facilities remain in place, but newly constructed pipelines were needed to circumvent the active work areas on the off-ramp.  Exhibit D to the Compendium is a depiction of the temporary drainage facilities that are being installed as of the date of this filing ("January Facilities").  (*Id*. at 9:1-5.)  The January Facilities are expected to be completed on or about January 20, 2020.  (Mills decl., 9:5-7.)  Between January 14, 2020 and the completion of the January Facilities, the design-builder continues to provide drainage for the Adjacent Properties in the form of passive drainage and back-up pumps, if necessary.  (*Id*. at 9:7-14.)

On Exhibits C and D is an oval-like shape located in the triangular space between the freeway and the off-ramp.  That oval-like shape is the future, proposed location for a detention basin.  A detention basin is a best management practices water quality measure, which will temporarily store stormwater and reduce contaminants in the runoff.  (Hromadka decl., 23:12-14.)  As shown on Exhibits C and D, the detention basin is not a component of the temporary drainage facilities.  (See also, Mills decl., 9:17-27.)  The earliest the detention basin can be constructed is 2022 because the site for the detention basin is currently being used as a crushing plant, which creates material used as part of the Project.  (*Id*. at 9:25-27.)

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

11

1467947.1

1

### E.     A State Court Rejected Plaintiffs' Similar Arguments

2

In eminent domain actions filed by OCTA, the state court has considered and

3

weighed Plaintiffs' arguments of alleged hardship caused by flooding concerns against

4

OCTA's need to proceed with the Project.  Furthermore, in those actions, Plaintiffs

5

acknowledged that their properties had been subject to periodic flooding and ponding

6

during rain events decades prior to any Project-related work.  (Ex. H.)

7

In 2018, OCTA filed two, related eminent domain actions in state court seeking

8

to acquire temporary construction easements from Plaintiffs for the Project.  (*Orange*

9

*County Transportation Authority v. M. Westland, LLC et al.*, OCSC Case No. 30-

10

2018-00994118, and *Orange County Transportation Authority v. Dorothy Sublett-*

11

*Miller and Walter J. Miller, et al.*, OCSC Case No. 30-2018-00994148, Ex. G.)[3]

12

Plaintiffs answered the two complaints stating, in part, that OCTA was not authorized

13

to acquire the easements because:

14

> "Historically, improvements and utilities on the [Property] have

15

> been significantly damaged due to flooding that occurs during

16

> periods of heavy rain.  The sewer and storm drain within the

17

> easement are critical in avoiding catastrophic flooding.  Without

18

> those drains, there are no other flood control devices sufficient to

19

> prevent widespread water damage."  (Ex. H, 74:25-75:2, 85:12-

20

> 16.)

21

In their answers, Plaintiffs demanded that OCTA "address the drainage and flooding

22

issues at the immediately adjacent Mobile Home Park," otherwise the areas being

23

condemned will "sustain water damage."  (Ex. H, 81:19-20, 92:10-13.)[4]

24

OCTA moved the state court for orders of prejudgment possession under

25

---

26

[3] Both actions are still pending.

27

[4] Plaintiffs' answers in the eminent domain actions are not the only forum where Plaintiffs are demanding a remedy to their historic flooding problem.  Plaintiffs also filed a separate action in state court seeking damages caused by the drainage facilities

28

in the public right of way: *M. Westland, LLC, et al. v. State of California, et al.*, OCSC Case No. 30-2019-01104539.  (Ex. L.)

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

1467947.1

California Code of Civil Procedure section 1255.410.  (Weisberg decl., 27:4-5.)  Two of four factors the court considered are relevant here: whether the condemning agency has an overriding need to possess the property prior to issuance of final judgment and whether the hardship that the agency will suffer if possession is denied or limited outweighs any hardship on the property owners if possession is granted.  (Cal. Code Civ. Proc., §1255.410(d)(2); Ex. K, p. 151.)

Plaintiffs opposed the motions, arguing, in part, that the pre-existing flooding issue Plaintiffs feared would be exacerbated was a hardship sufficient to defeat an order of prejudgment possession.  (Ex. I and J.)  Plaintiffs asked that the court precondition the orders of possession on OCTA's preparation of a "remediation plan for the flooding issue" and "OCTA's compliance with the remediation plan."  (Ex. I, 98:13-19; Ex. J, 125:19-24.)

The court found that OCTA demonstrated substantial hardship if the motions were denied.  (Ex. K, p. 152.)  By issuing the orders, the court rejected Plaintiffs' demands that OCTA remedy a pre-project flooding issue on Plaintiffs' property.

## 3.  <u>STANDARD - MANDATORY INJUNCTIONS ARE DISFAVORED</u>

To obtain a preliminary injunction, a plaintiff must make a "clear showing" that she is entitled to such relief, which is "a difficult task."  (*Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22 (2008); *Earth Island Inst. v. Carlton,* 626 F.3d 462, 469 (9th Cir. 2010).)  A plaintiff must show: (1) a likelihood of success on the merits; (2) likely irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) an injunction is in the public interest. (*Winter,* 555 U.S. at 20.)

Plaintiffs seek a mandatory injunction that would require action.  Injunctions requiring rather than prohibiting action are "particularly disfavored."  (*Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980).)  Courts should be "extremely cautious" about issuing mandatory injunctions which, "are not granted unless extreme or very serious damage will result" and should not be issued in "doubtful cases."  (*Id.*

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

1    at 1115; *Martin v. International Olympic* Committee, 740 F.2d 670, 675 (9th Cir.

2    1984).)    Plaintiffs' burden is "doubly demanding" when seeking a mandatory

3    injunction.  (*Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).)

4    **4.    PLAINTIFFS ARE UNLIKELY TO PREVAIL ON THE MERITS**

5          Plaintiffs' claims are to be reviewed under the highly deferential arbitrary and

6    capricious standard of review set forth in the Administrative Procedure Act ("APA").

7    (*Earth Island Inst. v. Carlton*, *supra*, 626 F.3d at 468.)  A plaintiff must meet a "high

8    threshold" to set aside actions under the APA.  (*River Runners for Wilderness v.*

9    *Martin*, 593 F.3d 1064, 1067 (9th Cir. 2010).)  An agency's action "need only be a

10   reasonable, not the best or most reasonable, decision." (*Id.* at 1070.)  A court may not

11   overturn an agency's decision because it disagrees with the decision or with the

12   agency's conclusions about environmental impacts.  (*Id.*)

13        **A.    Criticisms of the EIS Are Four Years Too Late**

14         The APA imposes a procedural requirement that plaintiffs must exhaust

15   administrative remedies before bringing suit in federal court.  (5 U.S.C. § 704; *Great*

16   *Basin Mine Watch v. Hankins*, 456 F.3d 955, 965 (9th Cir. 2006).) This requirement

17   applies to claims brought under NEPA.  (*Great Basin*, 456 F.3d at 965.)  The purpose

18   of this procedural requirement is two-fold: (1) to avoid premature claims; and (2) to

19   allow the agency to give meaningful consideration to, and bring its expertise to bear

20   on, the challenging party's claims.  (*Id.*)

21         All challenges to the EIS were time-barred unless filed on or before November

22   2, 2015.  (23 U.S.C. § 139(l)(1); 80 Fed.Reg. 31,948.) This included claims that could

23   have been raised but were not.  (*See, e.g., Highland Village Parents Group v. U.S.*

24   *Fed. Highway Admin.*, 562 F.Supp.2d 857, 864 (E.D. Tx. 2008) [finding plaintiff

25   should have attacked the original environmental document's failure to consider toxic

26   air contaminants, and that its later challenge to an environmental reevaluation on these

27   grounds was "an attempted end run around the statute of limitations."].)

28         The EIS analyzed the Project's potential floodplain and hydrology impacts, and

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

1   disclosed that a water quality device was planned adjacent to Plaintiffs' property.  (Ex.
2   N, pp. 205-242, EIS Chapter 3.2.1; EIS Chapter 3.2.2; EIS p. 3.2.1-1 [referencing
3   November 2011 Preliminary Drainage Report]; Preliminary Drainage Report, pp. 248-
4   250; Appendix Q, BMP Layout 25, pp. 246-247.)  Plaintiffs' claims regarding the EIS
5   that *could* and *should* have been raised in comments on the EIS, before the statute of
6   limitations expired: alleged lack of stormwater drainage system analysis in EIS
7   (Motion.,14:14-20); alleged lack of documented hydrologic or hydraulic work relating
8   to any of the build alternatives in EIS (Fleenor Decl., 4:6-11); alleged lack of relevant,
9   verifiable data regarding stormwater drainage system in EIS (*Id.* at 5:7-14); statements
10  and conclusions made in EIS related to drainage system are allegedly not based on
11  known facts or scientifically relevant data (*Id.* at 9: 7-11); and claims regarding a
12  planned water quality basin adjacent to Plaintiffs' property (Motion., 5:22).  Plaintiffs
13  did not submit comments on the EIS or file a legal challenge prior to November 2,
14  2015.  Plaintiffs' claims regarding the EIS are time-barred.

### B.   The Temporary Drainage Facilities Comply With the EIS

16         The Project is currently under construction.  The EIS concluded that the Project
17  would not result in temporary impacts to hydrology and floodplains during
18  construction with the inclusion of certain minimization measures.   (Ex. N, p. 218.)
19  The relevant minimization measures are:

20              HYD-3: Positive Drainage will be provided during construction
21              and refrain from diverting flows...
22              HYD-7: Construction activities between October and May shall be
23              limited to those actions that can adequately withstand high flows
24              and entrainment of construction materials.  (Ex. N, p. 219.)

25  As a result, the EIS requires that drainage consistent with these requirements be
26  provided during Project construction.

27         The temporary drainage facilities meet the EIS' requirements.  First, flows will
28  not be diverted during construction.  The pre-Project drainage system received and

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

accepted the water delivered through inlets #1, 4, 5, and 6, and the pipelines that serviced those inlets.  (Hromadka decl., 21:7-8.)   The temporary drainage system continues to accept water delivered through those four inlets and the pipelines that service those inlets.  (*Id.* at 21:9-12.)  The temporary drainage system outlets to the same downstream channel as it did pre-Project.  (*Id.*) It does not divert flows from the ultimate downstream destination.  (*Id.*)

Second, positive drainage will be provided during construction.  Positive drainage means that the runoff will drain under the force of gravity.  (*Id.* at 21:26-22:7.)  OCTA's hydraulic analysis demonstrates that the temporary drainage facilities have and will provide for positive drainage as required by the EIS.  (*Id.*)

Finally, the temporary drainage system is capable of withstanding high flows and entrainment of construction material.  (*Id.*)  As the temporary drainage system replaces the 3' x 2' box culvert with a 48" pipe, the cross-sectional area increases from 6 square feet to approximately 12.5 square feet.  (*Id.*)  OCTA's expert hydraulic analysis demonstrates that the temporary drainage system is capable of withstanding high flows and entrainment of construction material.  (*Id.* at 22:1-2.)

### C.     The Supplemental Environmental Review Claims Are Not Ripe

As explained in detail in OCTA's Motion to Dismiss and Caltrans' Motion to Dismiss, Plaintiffs' supplemental environmental review claims are not ripe.  (*See* Dkt. Nos. 18 and 16.)

### D.     No Supplemental Environmental Review Is Required

The Federal Highway Administration's regulations require that an EIS be supplemented where: (1) changes to the proposed action would result in significant environmental impacts that were not evaluated in the EIS; or (2) new information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS.  (23 C.F.R. §771.130(a).)

Plaintiffs assert that the contractor's proposed modifications in design plans, on

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

1   a drainage feature always contemplated to be a part of the Project, requires a

2   supplemental EIS.  The evidence proffered by Plaintiffs, however, does not meet the

3   threshold criteria for requiring supplemental environmental review.

4          Plaintiffs allege that the production of a report (the "Report") from their

5   engineers, Adam Streeter, which is critical of the proposed drainage plans, constituted

6   new information sufficient to trigger a duty to supplement the EIS.  OCTA, however,

7   retained an independent expert hydrologist, Theodore V. Hromadka II, Ph., to evaluate

8   the Report and the proposed drainage facilities.  Dr. Hromadka found that the Report

9   is based on false assumptions and that the proposed drainage facilities will provide

10  **better** drainage in the Caltrans right of way than was in place pre-Project.

11         Specifically, the Report alleges that Inlet #2 and possibly #3 drained into the

12  pre-Project drainage system, and that this was not accounted for in the post-Project

13  drainage plans.  (Hromadka decl., 24:27-25:5.)  The Report concludes that on-site

14  drainage from certain areas will be impeded.  (*Id.*)

15         Surveying work done on behalf of OCTA, however, shows no indication that

16  either Inlet #2 or Inlet #3 drained into the pre-Project drainage system.  (Hromadka

17  decl, 25:5-12.)  Furthermore, Exhibit 18 of the Plaintiffs' Compendium shows that

18  both Inlets #2 and 3 drained to the south and away from the pre-Project drainage

19  system. (*Id.*)   The production of the faulty Report, therefore, did not trigger an

20  obligation to supplement the EIS.  (*See, e.g., Russell County Sportsmen v. U.S. Forest

21  Service*, 668 F.3d 1037, 1046 (9th Cir. 2011) [plaintiffs offered "no credible reason" to

22  doubt Forest Service's analysis and District Court's finding that a supplemental EIS

23  was required was based on a mistaken premise.].)

24         Plaintiffs have not and cannot establish a likelihood of success on the merits,

25  and for that reason alone, the Motion should be denied.

26         **E.     The Requested Relief is Nonsensical**

27         Essentially, Plaintiffs ask to enjoin the construction of the temporary drainage

28  facilities.  (Proposed Order, ¶ 2.)  An order enjoining construction of the temporary

17

drainage facilities would likely cause the very flooding the Plaintiffs claim they are seeking to prevent and in fact, increase the likelihood of Plaintiffs' harm, as opposed to reduce it. The Plaintiffs have cited no authority for such an absurd order. In addition, the relief is inconsistent with the EIS, which requires drainage during construction.

## 5.   THERE IS NO EVIDENCE OF IRREPARABLE HARM

A preliminary injunction will not be issued simply to prevent the *possibility* of some remote future injury - there must be immediate threatened harm. (*Caribbean Marine Services Co., Inc. v. Baldrige* 844 F.2d 668, 674 (9th Cir. 1988).) Further, no "thumb on the scales" is warranted simply because this is a NEPA action. (*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-157 (2010).) Plaintiffs are primarily concerned with property damage not environmental injury here, but even if they were, harm to the environment is not presumed to require an injunction. (*Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 545 (1987) [the loss of $70 million that an oil company had committed to exploration outweighed environmental concerns].)

### A.   The New Facilities Have and Will Improve Pre-Project Conditions

During rain events on November 21, 2019, November 28, 2019, December 4, 2019, and December 25, 2019, the October Facilities Operated as intended. (Alonso decl., 13:21-27.) Plaintiffs did not report any flooding to OCTA after these events. (Weisberg decl., 28:1-3.)

The January Facilities are an improvement over pre-Project conditions, and will REDUCE the risk of flooding on Plaintiffs' property. (Hromadka decl., 21:20-23.) A hydraulic analysis was conducted to compare the performance of the January Facilities, as identified in Exhibit D, against the pre-Project drainage system. (*Id.* at 21:13-17.) The hydraulic analysis shows that the Hydraulic Grade Line (HGL) is lower at the outlets for the pipes servicing inlets #1, 4, 5, and 6 for the January Facilities than for the pre-Project drainage system. (*Id.* at 21:17-20.) This means that flooding risk on the Adjacent Properties is actually REDUCED by the January

1467947.1

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

Facilities.  (*Id.* at 21:20-21.)

**B.     The Detention Basin Will Not Be Constructed Until 2022**

Plaintiffs must demonstrate "immediate threatened harm."  (*Caribbean Marine Services Co., Inc. v. Baldridge*, *supra*, 844 F.2d at 674.)  If a trial on the merits is possible before the threatened harm will occur, a preliminary injunction should not issue.  (*See* Rutter Guide to Federal Civil Procedure Before Trial, § 13.56.1 (2019).)

Many of Plaintiffs' allegations are directed at the proposed detention basin in the Permanent System.  (Motion, 5:22; Tan decl., ¶¶24-28, 30; Fleenor decl., ¶¶22, 25.)  The detention basin, however, will not be constructed until 2022.  The detention basin, therefore, cannot reasonably be said to threaten immediate harm.  In fact, the trial in this matter is scheduled for November 3, 2020 - well in advance of the detention basin's operational date.  (Dkt. No. 38.)  On this basis alone, no preliminary injunction is warranted.

Further, despite Plaintiffs' parade of horribles, there is nothing unusual about the use of a detention basin for water quality purposes.  The purpose of the detention basin is to attenuate the peak discharge of the post-construction condition and reduce the sediment and particulate loading in runoff.  (Hromadka decl., ¶20.)  The detention basin has been designed using typical engineering concepts and design elements that are in common use and practice.  (*Id.*)

**C.     The Alleged Harm is Self-Inflicted**

Plaintiffs must show a sufficient causal connection between the alleged injury and the conduct to be enjoined so that the injunction would effectively minimize the risk of injury.  (*Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011).)  Here, there are significant deficiencies on the Adjacent Properties.  Caltrans and OCTA cannot spend public funds to fix the deficiencies on Plaintiffs' private property, which is what this lawsuit is really about.

For example, three of the four pipelines, installed by Plaintiffs, which deliver water to the ROW Property's drainage facilities are undersized.  (Hromadka decl.,

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

1467947.1

19

19:24-27.)   The pipeline serving Inlet #6, in particular, is 18" in diameter and traverses approximately 440 feet to reach the ROW Property's drainage system. (*Id.* at 19:27-20:2.)  This drainage pipe is grossly undersized for the acreage of watershed it is supposed to service. (*Id.*)   In fact, most of the pipelines on the Adjacent Properties were designed with a diameter and slope that causes the flow capacity of the pipelines to be deficient in handling the demand the Adjacent Property Owners need to accommodate. (*Id.* at 20:2-5.)

Additionally, the design of the connection between the Adjacent Properties' pipelines further reduces the capacity of the Adjacent Properties' drainage system to handle the flow demand that the Adjacent Properties need to accommodate. (*Id.* at 20:6-9.)   According to OCTA's survey, the 18" pipe on the Adjacent Properties, serving inlet #6, delivers water to inlet #5 at an elevation of 24.80 feet. (*Id.* at 20:9-12.)   However, the pipe on the Adjacent Properties which drains to inlet #5 has an invert elevation (the elevation of the bottom of the pipe) of 25.40 feet. (*Id.* at 20:12-14.)   Due to Plaintiffs' design, this means that water must pond to a depth of 0.6 feet at inlet #5 before the water can continue flowing downstream, which further reduces the flow capacity of the 18" pipe servicing inlet #6. (*Id.* at 20:14-16.)

There is a contract from 1960 between the State and Plaintiffs' predecessors regarding how drainage would work when the freeway was built and Plaintiffs' property was developed ("1960 ROW Contract). (*Id.* at 18:16-18.)  In that contract, the parties agreed to specific locations where the Adjacent Properties would deliver water to the ROW Property.   However, the drainage system on the Adjacent Properties is not delivering water to the pre-Project drainage system at the locations agreed to and specified in the 1960 ROW Contract. (*Id.* at 20:17-19.)  This diversion has the effect of delivering more water to the pre-Project drainage system than was contemplated under the contract and causes backwater effects, reducing the flow capacity of the Adjacent Properties' pipelines servicing Inlets #1, 4, 5 and 6. (*Id.* at 20:19-23.)

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

Specifically, per the 1960 ROW Contract and 1959 drainage study, the area serviced by inlets #5 and 6 was to drain further south in the ROW Property and thus would not be collected by the pre-Project drainage system. (*Id.* at 20:23-25.) The drainage system servicing inlets #5 and 6, however, is instead delivering water further north in the ROW Property than as agreed in the 1960 ROW Contract and per the 1959 drainage study. (*Id.* at 20:25-28.) Approximately 12.5 acres of land was to drain to the pre-Project drainage system per the 1959 drainage study and 1960 ROW Contract. (*Id.* at 20:28-21:2.) According to the Adams Streeter Report, however, approximately 28.9 acres was draining to the pre-project drainage system, which is over double the amount of land planned for in the 1959 drainage study. (*Id.* at 21:2-5.) The Adjacent Properties are, in fact, overburdening the ROW Property in violation of the 1960 Contract.

### D.   The Motion's Alleged Facts Are Incorrect

There are several factual inaccuracies and misleading conclusions in Khoon Tan's Declaration in Support of Plaintiff's Motion for Preliminary Injunction ("Tan Declaration"). The Tan Declaration alleges that the temporary facilities will cause significant and widespread flooding for potentially prolonged periods. As demonstrated, however, if flooding occurs, the culprit will be, as it has been historically, Plaintiffs' own drainage system because it does not have the flow capacity sufficient to meet the Adjacent Properties' runoff demands. The temporary drainage system will enhance the ability of the ROW Property to accept runoff demands from the Adjacent Properties when compared to the pre-Project drainage system. (Hromadka decl., 21:20-21.)

Additionally, the Tan Declaration alleges that the temporary facilities do not account for stormwater runoff contributions from the existing underground 24" drainage pipe lateral that drains a large section of the Adjacent Properties. (Tan decl., ¶32.) But this is not true, according to OCTA's hydrologist. Between drainage system element 828m and drainage system element 828k is the junction with the 24" drainage

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

1467947.1

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

pipe lateral. At this location the flow rate increases from 17.89 cubic feet per second (cfs) to 38.63 cfs, an increase of 20.74 cfs. This increase in flow rate can only be attributed to the stormwater runoff contributed from the underground 24" drainage pipe lateral. In other words, the Hydraulic Routing Summary data provided for Drainage System No. 828 does account for the effects of the stormwater runoff contributions from the existing underground 24" drainage pipe lateral.  (Hromadka decl., 24:13-26.)

### E.   Plaintiffs Can Mitigate the Purported Harm

In determining whether a plaintiff has demonstrated irreparable harm, a court may consider whether plaintiff could mitigate its losses.  (See, e.g., *Chlorine Institute, Inc. v. Soo Line R.R.*, 792 F.3d 903, 915 (8th Cir. 2015) [denying requested injunction that would freeze requirement to provide special rail cars to transport hazardous materials where plaintiffs failed to explain why they did not attempt to find alternative ways to meet their shipment needs, and increased costs would be compensable economic harm.].)

Here, Plaintiffs can remediate its drainage system by enlarging its drainage inlets and pipelines.  (Hromadka decl., 22:10-12.)   Immediate approaches for flood risk reduction also exist.  (*Id.* at 22:13-18.) For example, sandbagging is a common and readily available technique to address anticipated flooding endorsed by Federal Emergency Management Agency and the Army Corps of Engineers.  (*Id.*)  Since Defendants cannot use public funds to fix the deficiencies on Plaintiffs' property, Plaintiffs can and must mitigate the purported harm themselves.

### F.   Plaintiffs Waited Since at Least 2018 to Seek Injunctive Relief

A "long delay" before seeking injunctive relief "implies a lack of urgency and irreparable harm." (*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) [finding no harm imminent and no compelling reason for a preliminary injunction where the challenged practice had continued unchallenged for several years]; see also *Garcia v. Google, Inc.*, *supra*, 786 F.3d at 746 [delay of

approximately three months in seeking injunction "undercut Garcia's claim of irreparable harm" regarding alleged copyright -infringing video posted on Youtube].)

Plaintiffs have been arguing that the ROW Property is responsible for flooding on its property since at least 2018.  (Exs. E F, H, I, J.)  Plaintiffs did not seek injunctive relief until late 2019. This delay significantly undermines Plaintiffs' allegations of immediate, irreparable harm.

**6.**   **AN INJUNCTION IS NOT IN THE PUBLIC INTEREST**

"The third and fourth factors, harm to the opposing party and the public interest, merge when the Government is the opposing party." (*Nken v. Holder,* 556 U.S. 418, 435 (2009).)   As the Supreme Court has emphasized, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." (*Winter*, *supra*, 555 U.S. at 24 [citations omitted].)

**A.**   **The Project's Environmental Benefits Should Not Be Delayed**

Here, the traveling and tax-paying public will be harmed if the Project is enjoined.  Construction of the Project is half way complete.  Every day that the Project is delayed means that the traveling public is inconvenienced for that much longer and deprived of the safety and efficiency benefits of the Project.  (Mills decl., 10:24-26.) Almost 300,000 vehicles use this section of the I-405 every day.  (*Id.* at 10:26-27.) Not included in that figure are all the vehicles that use the Bolsa Chica bridge every day.  (*Id.* at 10:27-28.)   The traveling public is harmed by any delays in Project delivery.  (*Id.* at 10:28.)   As disclosed in the EIS, by increasing efficiency and reducing congestion, the Project will improve air quality, reduce GHG emissions, reduce congestion-related collisions, and make travel safer.  These efficiency, safety, and environmental benefits should not be delayed.

**B.**   **Project Delay at This Location Could Cost $140,000 Per Day**

Because this is a design-build project, the design-builder is responsible for and in charge of the scheduling and sequencing of work.  (Mills decl., 10:11-12.)   If

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

1467947.1

OCTA is forced to direct the contractor to re-sequence work around the drainage systems in the ROW Property and such re-sequencing causes delays to Project work on the critical path, then OCTA would be potentially liable to the contractor for liquidated damages of $140,000 per day of delay.  (*Id.* at 10:9-15.)

One of the critical and time-sensitive activities that is being undertaken in the immediate vicinity of plaintiffs' properties is the construction of the Bolsa Chica bridge.  (*Id.* at 10:16-23.)   Right now, half of the Bolsa Chica bridge has been demolished as part of a two-phase bridge reconstruction.  (*Id.*)  If OCTA is ordered to pause work on the drainage facilities for several months if not years and that causes a resequencing of work on the Bolsa Chica bridge, the likelihood that it will delay the Project completion date increases dramatically as does OCTA's potential exposure to contractual delay damages.  (*Id.*)

## C.   **Plaintiffs Are Forum Shopping**

In balancing the hardships on a motion for preliminary injunction, a court may take into account the extent to which plaintiffs are forum shopping a dispute.  (See, *e.g.*, *Castellanos v. Countrywide Bank*, 2015 WL 1906074, *6 (N.D. Cal. 2015) [viewing with disfavor plaintiff's attempt to block a foreclosure sale in a preliminary injunction motion in federal court on "markedly similar facts and legal theories" that were denied in a state court motion for preliminary injunction.].)

Plaintiffs already asked a state court to delay the Project based on their hardship – the potential for flooding.  The state court weighed the relative hardships of the parties and concluded that OCTA and the Project would face greater hardship if possession was denied than Plaintiffs would if possession was granted.  This fact is noticeably absent from the Motion and weighs significantly against Plaintiffs in the balance of hardships.  (*Castellanos, supra,*  at p. *6 [plaintiff's forum shopping and delay "tips the balance of hardships to Defendants."].)

## 7.   **A BOND IS APPROPRIATE TO ENJOIN A $1.9 BILLON PROJECT**

Though a preliminary injunction should not issue, if this Court finds that an

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

1    injunction is warranted, Federal Rule of Civil Procedure 65(c) states that, "[t]he court

2    may issue a preliminary injunction…only if the movant gives security in an amount as

3    the court considers proper to pay the costs and damages sustained by any party found

4    to have been wrongfully enjoined or restrained."

5         Plaintiffs allege that they are pursuing public interest litigation, and no bond

6    should be required.  To the contrary, Plaintiffs are seeking to promote their own

7    financial interest.  As a result, the Court should use the default, mandatory rule in

8    Federal Rule of Civil Procedure 65(c).

9    **8.**    <u>**CONCLUSION**</u>

10         Plaintiffs seek to enjoin a $1.9 billion freeway improvement project that will

11    improve safety, travel times, and reduce air quality impacts from several hundred

12    thousand vehicles that travel this section of the I-405 every day based on a false

13    allegation that the Project has increased the likelihood of flooding on private property

14    when, in fact, it has done just the opposite.   Plaintiffs' property has been subject to

15    flooding well before the Project construction was begun and is not related to the

16    Project.   Instead, it is due to Plaintiffs' own poorly designed private drainage

17    facilities.  This case is about Plaintiffs' efforts to hold hostage the Project which will

18    benefit hundreds of thousands of people in order to get public tax dollars to fix their

19    self-inflicted problem.  Plaintiffs are unlikely to win on the merits, the public interest

20    weighs heavily against the injunction, and the alleged harm Plaintiffs claim they will

21    suffer is not only not irreparable it does not even exist.

22    DATED:  January 20, 2020        WOODRUFF, SPRADLIN & SMART, APC

23

24                        By:<u>*s/Ricia R. Hager*           </u>

25                          GARY C. WEISBERG

26                          LAURA A. MORGAN

                           RICIA R. HAGER

27                          Attorneys for Defendant ORANGE

                           COUNTY TRANSPORTATION

28                          AUTHORITY, a public entity

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

## **PROOF OF SERVICE**

## **STATE OF CALIFORNIA, COUNTY OF ORANGE**

I am over the age of 18 and not a party to the within action; I am employed by WOODRUFF, SPRADLIN & SMART in the County of Orange at 555 Anton Boulevard, Suite 1200, Costa Mesa, CA 92626-7670.

On January 20, 2020, I served the foregoing document(s) described as **DEFENDANT ORANGE COUNTY TRANSPORTATION AUTHORITY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

☒    by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list;

☐    by placing ☐ the original ☐ a true copy thereof enclosed in sealed envelopes addressed as follows:

☐    **(BY MAIL)** I placed said envelope(s) for collection and mailing, following ordinary business practices, at the business offices of WOODRUFF, SPRADLIN & SMART, and addressed as shown on the attached service list, for deposit in the United States Postal Service. I am readily familiar with the practice of WOODRUFF, SPRADLIN & SMART for collection and processing correspondence for mailing with the United States Postal Service, and said envelope(s) will be deposited with the United States Postal Service on said date in the ordinary course of business.

☒    **(BY ELECTRONIC SERVICE)** by causing the foregoing document(s) to be electronically filed using the Court's Electronic Filing System which constitutes service of the filed document(s) on the individual(s) listed on the attached mailing list.

☐    **(BY OVERNIGHT DELIVERY)** I placed said documents in envelope(s) for collection following ordinary business practices, at the business offices of WOODRUFF, SPRADLIN & SMART, and addressed as shown on the attached service list, for collection and delivery to a courier authorized by _____ to receive said documents, with delivery fees provided for. I am readily familiar with the practices of WOODRUFF, SPRADLIN & SMART for collection and processing of documents for overnight delivery, and said envelope(s) will be deposited for receipt by _____ on said date in the ordinary course of business.

☒    (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury that the above is true and correct.

Executed on January 20, 2020 at Costa Mesa, California.

                          _s/Kathleen Moore_____
                          Kathleen Moore

1467947.1

1
2

## <u>M. WESTLAND, LLC, et al. v. CALIFORNIA DEPARTMENT OF TRANSPORTATION, et al.</u>

3
4
5

## <u>UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA</u>
## <u>CASE NO.:  8:19-cv-01661-DFM</u>
## <u>ASSIGNED TO HONORABLE JAMES V. SELNA</u>

6

### SERVICE LIST

7
8
9
10
11
12
13

David A. Robinson                                        Attorneys for Plaintiffs
Anjuli B. Woods
Eric Golas Salbert
Thomas S. Van
Enterprise Counsel Group
Three Park Plaza, Suite 1400
Irvine, CA 92614
Tel:  (949) 833-8550
Fax:  (949) 833-8540
Email:  esalbert@ecg.law
Email:  drobinson@ecg.law
Email:  awoods@ecglaw
<u>Email:  tvan@ecg.law</u>

14
15
16
17
18
19
20
21
22

Jeanne R. Scherer                                        Attorneys for Defendants STATE OF
Jeffrey R. Benowitz                                      CALIFORNIA DEPARTMENT OF
Glenn B. Mueller                                         TRANSPORTATION    and    BOB
John Frederick Smith                                     FRANZOIA
Vanessa C. Morrison
Amy M. Serieys
State   of   California,   Department   of
Transportation
Legal Division
4050 Taylor Street, MS-130
San Diego, CA 92110
Tel:  (619) 688-2531
Fax:  (619) 688-6905
Email:  Jeffrey.r.benowitz@dot.ca.gov
Email:  glenn_b_mueller@dot.ca.gov
Email:  john.f.smith@dot.ca.gov
Email:  vanessa_morrison@dot.ca.gov
Email:  Amy.Serieys@dot.ca.gov

23
24
25
26
27
28

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

1467947.1

27